# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

```
_____X
UNITED STATES OF AMERICA,                 :
                                          :        Case No.  06-cr-550 (JS)
                 Plaintiff,               :
                                          :
        v.                                :
                                          :
SANDRA HATFIELD and DAVID H. BROOKS,      :
                                          :
                 Defendants.              :
_____X
```

CERTIFICATE OF COUNSEL PURSUANT TO 28 U.S.C. §144

I am one of the attorneys of record for David Brooks, and hereby certify, pursuant to 28

U.S.C.  §144, that I have read the accompanying affidavit, which to the best of my knowledge is

factually correct and the Motion for Recusal filed herein, which are both filed in good faith.

Dated:  December 27, 2013

/s/ _____

Attorney for Defendant
David Brooks

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
UNITED STATES OF AMERICA,

      -against-                       Docket Number (S-2) 06 Cr. 550 (JS)

DAVID H. BROOKS,
                Defendant.
-------------------------------------------------X

## AFFIDAVIT OF DAVID H. BROOKS

**DAVID H. BROOKS** being duly sworn and deposed states the following under the penalty of perjury:

I am the Defendant in the above captioned matter. I make this Affidavit in compliance with 28 U.S.C. § 144 and in furtherance of my motion for the recusal of the Honorable Joanna Seybert, pursuant to 28 U.S.C. §§ 144, 455(a), 455(b)(1), and the Due Process Clause of the United States Constitution, from any and all proceedings, criminal and civil, in which I am a party. This motion is based, in part, upon the following facts and events which are set forth in detail below:

I.      Threats allegedly made by me against Your Honor and others; Page - 3

      **(A)** Alleged propensity toward violence; Page -7

II.     The waiver of recusal without my consent; Page - 11

III.    The "Pathfinder Investigation"; Page - 11

IV.    Jury mismanagement; Page - 16

      **(A)** Deliberations, Page - 16
      **(B)** Ex Parte Communications, Page 23

(C) Jury Tampering, Page -25

V.      The Government's refusal to turn over 302s; Page - 26

VI.     The Court's mismanagement of my medications; Page - 28

VII.    The Court's handling of bail and bail revocation; Page - 36

VIII.   The Nullity of the S-1 Indictment. Page - 39

## Background of the Case

I was arrested with regard to the charges contained in the above referenced indictment on October 25, 2007.

I exercised my constitutional right to a trial in this matter. Jury selection commenced January 19, 2010, and as Your Honor was fully aware, I was suffering from deprivation and mismanagement of my medication rendering me unable to cogently participate in the proceedings. A verdict of guilty to counts 1-11 and 15-17 was returned on September 14, 2010.

Post-trial litigation was, and continues to be, voluminous. During the period between November 6, 2012 and July of 2013, Your Honor made rulings with regard to numerous substantive motions and applications filed on my behalf. On each and every substantive application, the transparency of your personal judicial bias was evidenced by your rulings and decisions against me without any oral argument or evidentiary hearings.

The sentence proceeding in my case took four days to complete. It occurred on August 7, 2013, August 8, 2013, August 12, 2013 and August 15, 2013. On August 22, 2013, a judgment was entered against me. (Docket Entry 1707)[1] The sentence you imposed represents a personal judicial bias and prejudice, among other things, 204 months' imprisonment, five years of

---

[1] "Docket Entry" herein refers to the entries on the public docket sheet maintained in the District Court.

supervised release and a maximum monetary fine of eight-million-seven-hundred-thousand dollars ($8,7000,000.00).   The sentence clearly reflects a significant unwarranted disparity compared to similar financial cases that have recently been tried in the Second Circuit.

On August 26, 2013, a timely notice of appeal was filed. (Docket Entry 1711).

Issues regarding restitution and other financial matters remain outstanding before Your Honor, as do several civil matters. My criminal and civil cases were and continue to be highly publicized in both the national and local media.  Most recently an article was published in the *New York Law Journal* on December 10, 2013 and I am sure that this Motion and Affidavit will further peak media interest. Therefore, it is critical for there to be a judge assigned to my case who can handle all of the moving parts in a fair, non-prejudicial and impartial manner. It is my belief that Your Honor has not displayed any of these qualities in my case. Recusal is mandatory to show that the "necessary and proper" judicial process is working fairly.

## I.    Alleged Threats of Violence Against Your Honor and Others

In mid-October 2013, I received a transcript of a telephone conference that took place on July 18, 2013. (Docket Entry 1689, Exhibit A) I was not a party to this conference.  Without my knowledge or consent, my attorneys Richard Greenberg and Tai Park waived my appearance.[2]

It was – and is – the required practice in my case that whenever I elected to waive an issue, including my appearance, I did so in writing. This practice was dependent upon me being made aware of the hearing itself, and the issues to be raised therein.  Your Honor understood the importance of requiring a written waiver from me, but in some instances even my written waiver was insufficient to satisfy Your Honor's preference that I be present.  By way of example, with regard to a previous status conference scheduled for June 7, 2013, I waived my appearance in

---

[2] Attorney Steven Yurowitz also participated in the conference.

writing as the issues to be discussed were purely procedural in nature. Nonetheless, when an application was made to excuse me from that conference, the application was denied by Your Honor and the government was directed to take the appropriate steps for my production in court (Docket Entry 1667). Yet when the July 18, 2013, conference was held with regard to a matter that would have had an enormous impact on my future appearances before Your Honor, including but not limited to my upcoming sentencing, issues of forfeiture and restitution, and "threats of violence" allegedly made by me, I was not present at said hearing.

The July 18, 2013, telephone conference occurred after the government had publicly provided notice, via the electronic case filing system ("ECF") that between approximately November 6, 2012 and July of 2013, the United States Marshals Service (the "Marshals"), the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office for the Eastern District of New York (the "government") investigated allegations that I discussed physically harming Your Honor, members of the prosecution team and current members of the defense team. (Gov't Letter of July 18, 2013, Docket Entry 1687) Since the letter discussed salacious allegations that were never found to be credible, and to date still have not been credited, it should never have been placed on the public docket. Your Honor expressed a concern about this issue during the telephone conference.

The government's July 18, 2013 letter further disclosed that Your Honor had been previously made aware of the "alleged threat" against you as part of the Marshal's standard protocol when law enforcement is made aware of potential threats. Proceedings are currently underway to uncover the nature of the covert investigation including what Your Honor was told, by whom, and when, as well as to determine whether you and your family members, or members of the prosecution team, were provided protection, and/or if alternative security measures were

4

put into effect. To date, Your Honor has handled these proceedings with the same dismissive attitude as all other proceedings in my case.

We have also inquired as to why my defense attorney Gerald Shargel was not immediately made aware of the threats of "physical harm" allegedly made against him in compliance with law enforcement protocol (See Composite Exhibit B). I have been informed that one day before the telephone conference, on July 17, 2013, my attorney, Gerald Shargel and my brother, Jeffrey Brooks,[3] were advised of the "alleged threats."

Prior to July 18, 2013, I had not been made aware of the investigation into these "alleged threats" of violence. It is my position that if I had known of said "alleged threats" prior to July 18, 2013 I would have sought Your Honor's recusal over any matters pertaining to me.

Immediately after the government filed the July 18, 2013 letter via ECF (Docket Entry 1687), my attorney Richard Greenberg filed a letter addressed to Your Honor. (Docket Entry 1688) In that letter Mr. Greenberg noted that the government had inexplicably publically filed a letter advising counsel for the first time of the covert investigation regarding "alleged threats" of violence made by me. Mr. Greenberg went on to advise Your Honor that although the government had unequivocally told counsel the investigation uncovered no credible evidence of threats, the attorney for the government refused to reduce this information to writing.

Shortly after the filing of these two letters (neither of which I received copies of until mid-October 2013), Your Honor contacted the parties and arranged for a telephone conference, which took place at 4:40 p.m. on that same day.

The transcript of the July 18, 2013, telephone conference clearly indicates that Your Honor had major concerns with regard to the public filing of the information contained within

---

[3] See Affidavit of Jeffrey Brooks (Docket Entry 1766, Attachment 3).

the government's letter. Although the government's letter was authored by Assistant United States Attorney Patrick Sean Sinclair, upon reviewing the letter Your Honor contacted Marshall Miller, the Chief of the Criminal Division in the Eastern District of New York. AUSA Miller had previously been assigned many years earlier, not as a trial attorney in this matter, but originally as part of a covert investigation noted below as the "Pathfinder Investigation."

During the telephone conference, Your Honor first inquired as to why you had not been contacted regarding the public filing of the government's letter.  Second, Your Honor wanted to know why the letter was publically filed, indicating that you were not certain that it should remain on the public docket. And, third Your Honor wanted to know why there was no mention in the letter that, despite a lengthy investigation, the threats could not be substantiated. (Exhibit A, P.3). To date, I am not aware if any of the above mentioned questions have been answered.

Your Honor's comments throughout the telephone conference made clear Your Honor's familiarity with the "alleged threats" and Your Honor's concern with being able to manage the disclosure of the threats.

In response to Your Honor's inquiry, the government filed a supplemental letter dated July 18, 2013 (Docket Entry 1690), which I also did not receive a copy of until mid-October 2013. In that letter the government would not categorically state that the threats were unsubstantiated. Rather, the government skirted the issue by stating "to date, the government has not identified corroboration of these allegations and does not credit them." (Emphasis supplied)

None of the language employed by the government in either of its letters indicates that the investigation has been concluded.  The letters only provide counsel with notice of the investigation. There are no details regarding the information garnered from the covert

investigation. Accordingly, there is a suggestion that the investigation is ongoing and that the matter has not been fully resolved.

Subsequent to being advised of the "alleged threat", and during the covert investigation, Your Honor ruled on a number of substantive motions filed by my lead attorney Alan Dershowitz. As each and every motion was supported by the facts and the law, it is my belief that I should have prevailed on said motions. However, Your Honor ruled against me on every application. The motions included a *Skilling* motion (Docket Entry 1629), a renewed Mental Capacity Motion (Docket Entry 1637), and a motion with regard to the validity of the indictment. (Docket Entry 1594)  Each motion was summarily denied without any opportunity for oral argument or a hearing.

These erroneous rulings, and others discussed below, coupled with your full knowledge of the alleged threats of violence, demonstrate a clear personal judicial bias and prejudice against me and partiality toward the government. Thus, recusal is mandatory under Title 28 U.S.C. § 455(a).

## (A)    <u>Alleged Propensity Toward Violence</u>

Previous unsubstantiated allegations of violence or wrong doing made by the government, and Your Honor's clear acceptance of the allegations, further substantiate that Your Honor's recusal is "necessary and proper" as you have demonstrated a clear appearance of prejudice and partiality as follows.

### i)    <u>The Proceedings of Co-Defendant Dawn Schlegel</u>

The investigation into threats of physical harm allegedly made by me against Your Honor and others, was not the first time that Your Honor had heard unsubstantiated allegations of physical violence about this affiant. For years, the government conditioned and tainted you to

believe that I am willing to commit acts of violence and that I am capable of inflicting bodily

harm. During the October 23, 2007, criminal cause for guilty plea by co-defendant Dawn

Schlegel, the following discussion occurred in Your Honor's courtroom.

> **AUSA MARTIN**: Well, the government is in possession of a great deal of information regarding the defendant's past conduct, including things as recently as, I believe, this year, in which many, many different types of disputes, either legal disputes or business disputes, the defendant has threatened violence.

> **THE COURT**: The defendant?

> **AUSA MARTIN**: I'm sorry, Mr. Brooks, the target, the person we are talking about here, has threatened violence. He has actually engaged in some level of physical violence, and has made allusions to connections, which he has, to people who are involved in organized crime and are capable of committing serious crimes of violence. And, in fact, the government has investigated and determined that the defendant did for a substantial period of time, in fact, have contacts with individuals who are identified as members of organized crime. In addition the defendant – I am saying the defendant – target's behavior recently has become extremely erratic and irrational. He has recently been accused of assaulting his attorney in England, threatening to kill his attorneys in England. And one of these attorneys is representing him in connection with this investigation. There is testimony before the SEC that at the end of his tenure at DHB he was essentially raving and ranting during board meetings, saying things irrational and comparing himself to Jesus on the cross. Accordingly, we are – we have definite concerns about his ability to abide by the law.

> **THE COURT**: And carry out some of these threats?

> **AUSA MARTIN**: He has, as I said – he has told people that he knows people, and he can carry out these threats. And we are aware of evidence that at least during a substantial period of time while he was at DHB he had those contacts and connections. In addition, in one of the instances, which is related to the charges in the indictment, you may recall from the indictment, that an individual who was controller at Point Blank facility disclosed concerns about improper accounting to auditors. When Mr. Brooks learned of that he confronted this person, threatened him, threatened his future jobs, and also physically destroyed property, tried to take the person's personal property, tried to seize personal

items of property from this individual, and basically chased him out of the facility. Again, this is because this person had alerted the auditors to accounting irregularities. So, in light of that you can imagine what we might expect the reaction to be if he were to learn, or if he were to have the ability to take action against someone who is cooperating with criminal authorities.

**THE COURT**: Mr. Martin, I don't tell you how to do your job; it is certainly your bailiwick. But I would assume you have gotten into place certain safeguards for Ms. Schlegel's safety.

**MR: MARTIN**: That's correct, Your honor.

**MR. HENOCH**: Judge, and if I may, Your Honor, I appreciate the Court's indulgence. As you are aware, Judge, **I believe from prior proceedings, and/or the civil case, Ms. Shlegel has worked for Mr. Brooks for a number of years**. She heard him make numerous threats against other people. She witnessed his erratic and extraordinarily violent behavior for years, and the conversation that AUSA Martin just pointed out in which Mr. Brooks made some threats to the controller; she actually heard that statement herself. She had witnessed the behavior herself. And that's part of the reason she is upset today. **She is very nervous about her safety. As Your Honor is aware, she was upset during this entire proceeding and I think the record can entirely reflect that.**

**THE COURT**: … You (Ms. Schlegel), of course, must keep in touch not only with your attorneys, but the government. And I would certainly advise you to be as cautious as possible. **And if at any time you need additional protection you contact the government to get that.**

(Court proceeding of October 23, 2007).

ii)      **Allegations Made During My Bail Proceedings**

Just two days later, in connection with my October 25, 2007 arrest, AUSA Martin filed a

letter arguing for a permanent order of detention. Among the numerous inflammatory allegations

included therein, and throughout the case, were as follows:

Specifically, Mannarino testified that Burt Sacher requested financial information about TAP at a meeting with Brooks. Brooks

turned to Mannarino and said "I'd like to shoot the motherfucker. (Referring to Mr. Sacher)

(Presentence Report ("PSR") P. 25-26 and P. 48-49)

Additionally, there was an allegation made by Barry Gauthier as follows:

> Please do not let David Brooks make bail. He will disappear or he will hurt someone. I know firsthand as I have seen his work personally. I was the first person he hired back in 1995 for his company NDL that he bought out of bankruptcy down in Florida. It is where the former DHB is located in Pompano Beach. He threatened to kill me more than once in the four months I worked for him and after I left the company. In my first week on the job for him I also witnessed him try to stab a cab driver in Munich, Germany where I had to literally pull him off the cab driver and watched him pull a knife and threaten the head of one of our European wholesalers at dinner, in Amsterdam right after the Munich incident.

These unsubstantiated allegations of physical violence were successful in that they conditioned and tainted you to develop a prejudice and personal judicial bias towards me. As set forth below, this resulted in, among other things, the draconian bail conditions set by Your Honor.  The above, along with uncharged criminal allegations that Your Honor learned in connection with civil cases over which you presided, created a mind-set that severely prejudiced me in that Your Honor developed an unfair partiality toward the government. Again, you should have recused yourself *sua sponte*.

II.   **Waiver Of Recusal Without My Consent**

As stated above, I did not receive a copy of the transcript of the July 18, 2013, telephone conference until mid-October of 2013.  I also did not receive the copies of the two letters filed by the government on July 18, 2013 (Docket Entries 1687 and 1690), nor the July 18, 2013 letter filed by Mr. Greenberg (Docket Entry 1688), until mid to late October 2013.

Mr. Greenberg also submitted a letter to Your Honor dated July 19, 2013, which indicates that I "had no intention of moving to recuse or disqualify the Court." (Exhibit C)  This letter was not filed on the public docket and I did not receive a copy of it until mid to late October 2013, when I received the government's two letters of July 18, 2013, and the transcript of the telephone conference.

I disavow the assertions in Mr. Greenberg's letter of July 19, 2013.  I had no discussion with any attorney regarding the possibility of recusal.  If I did, I would never have waived it. Moreover, it has always been the practice in this case that if I intend to waive an issue I would do so only in writing.  That is noted above with regard to the conference of June 7, 2013.  Then again on October 29, 2013, I elected to waive my appearance in court at a status conference and I did so in writing.

At no time is there a statement from me on the record indicating that I waived my right to file a recusal motion.  No waiver can be found from me in this case because I never agreed to waive the issue.

III.   **The "Pathfinder Investigation"**

Prior to the actual trial in this matter, the Attorney General of the United States, Eric H. Holder, Jr. ordered the Department of Justice's Public Integrity Unit to become involved in an investigation which included allegations of corruption against Your Honor, the United States

Attorney's Office for the Eastern District of New York and the FBI Agents involved in my investigation. This investigation and the proceedings that were related to it were referred to as the "Pathfinder Investigation" or the "Pathfinder Proceedings." To the best of my knowledge all of the Pathfinder motions and the related proceedings were filed and/or conducted under seal but have since been publically revealed. (See, for example, the transcript of November 24, 2009, (Exhibit D) as well as other public proceedings referenced herein below.)[4] It is my further belief that a review of the sealed Pathfinder documents will establish that Your Honor was clearly unable to preside over my criminal proceedings in a fair and impartial manner as required by law, particularly when later coupled with the bogus "threat allegation" and the very real prejudicing effect of an eight-month long threat investigation and related security measures.

During the course of the investigation Your Honor was receiving ex parte *Brady* information directly from the Public Integrity Unit that was assigned to this investigation by Attorney General Holder. It is believed that the ex parte information shared with Your Honor included the allegations of impropriety on your part, which exacerbated your ongoing personal judicial bias and prejudice against me.

It is my belief that on June 15, 2009, my attorney James LaRossa sent a letter to Your Honor which made clear that the "Pathfinder Investigation" included allegations of impropriety related to you.

Thereafter, at a September 24, 2009 court proceeding Your Honor acknowledged that allegations against you were part of the "Pathfinder Investigation."

> **MR. LaROSSA: Your Honor, we are in a peculiar position here, too, with respect to these potential motions that are being brought. With all due respect – and I really mean that; I**

---

[4] In order to properly determine this recusal motion, these sealed submissions must be reviewed in camera by a fair and impartial referral judge.

respect this Court in its entirety – I'm not sure this motion should come before this court.

THE COURT: Well, if it is a motion to recuse me, then I would like to know about it now so I can deal with it.

MR. MURPHY: It is going to wind up in that respect. Yes, it probably will. There is more to it than that, Your Honor.

THE COURT: Well, I am not clairvoyant, Mr. LaRossa, and you have to have a position here. Either you are going to say I can get the information from the office or there comes a point in time when I'm going to say: Look. We are on trial. These motions will come in as they come in.

MR. LaROSSA: I understand that. But we are in a position of not knowing what is being told to you in camera. How do we confront that? That is the choice that Mr. Bonilla has made and Your Honor has gone along with. So for us to suggest to Your Honor where we are going to go with respect to these motions without knowing that information puts us in a peculiar position. Now, we were ready to bring this motion on three or four weeks ago. We were asked not to by the government.

THE COURT: Well, you have to make a choice here. The government is saying don't bring the motion. They are also – and when I say the government, at this point I'm obviously referring to your office, Mr. Bonilla.

MR. LaROSSA: Yes. We are, too.

THE COURT: And the defendants have initially instigated this, if you will. Based on their allegations and investigation I have delayed the trial for four months. The government, Mr. Bonilla's office has requested that delay. And now I'm being told there are some potential motions that you don't want to disclose to me. The only thing I can think of is obvious, and that is a motion to recuse me based on some investigation that you may have going. I don't know, Mr. LaRossa. But I cannot fathom which way we are going to be going on this case without knowing some of the consequences. It is not the first motion that I have ever had to be recused.

MR. LaROSSA: Well, it is the first one I have made to recuse you, so I'm thinking very carefully about it.

13

**THE COURT: And that is a choice you will have to make.**

**Mr. LaROSSA: <u>I know that Your Honor.</u>**

• • •

**MR. MURPHY: Your Honor, we were asked a direct question about whether or not we would object to your hearing the progress of the investigation. And I think it would put the court in a difficult position, and puts us in a difficult position, if you did. And so we object to you hearing that part of it because of what Mr. LaRossa just told you.** Unfortunately, and this isn't because of anything we have alleged and we have brought to the court's attention, <u>**the Court's name has come up in this investigation. You're now part of it.**</u>

**THE COURT: <u>Yes.</u>**

On October 21, 2009, with the approval of my then attorneys, James LaRossa, Ira Sorkin, William Murphy, Kenneth Ravenell, Richard Levitt, Charles Ogletree, Richard Beneviste, John Meringolo and Peter Smith, a motion was filed in which it was explicitly alleged that the Pathfinder Organization had <u>**corrupted Your Honor through your contacts with Alphonse D'Amato**</u>, the New York Senator.   D'Amato's reputation has repeatedly been called into question by the media with allegations regarding his suspect associates and activities. Despite these clear allegations against you, and your ethical duty to evaluate your ability to be fair and impartial, you did not recuse yourself.

While this issue was pending, the government acknowledged that its recusal was required to properly decide certain issues.  In a letter to the Court dated October 29, 2009, AUSA Marshal Miller, head of the Criminal Division in the Eastern District of New York,  advised the Court of the following:

> Because the defense motion includes conjecture that Assistant United States Attorneys ("AUSAs") in the Office might have acted improperly, it will be necessary to gather information from members of the trial team and other AUSAs referenced in the

14

motion in order to respond. As a result, in an abundance of caution, United States Attorney Benton J. Campbell has directed that AUSAs who are not on the Brooks trial team, not referred to in the motion and who have played no other role in the case handle the litigation of the motion. In particular, United States Attorney Campbell has asked me to take the lead in responding to the motion. Otherwise, United States Attorney Campbell has directed me not to participate in prosecution of the Brooks case.

A review of the transcript in this matter subsequent to the "Pathfinder Proceedings" makes clear that Your Honor was partial to the government even as far back as those proceedings. The following excerpts demonstrate that the "Pathfinder Proceedings" created an irrefutable bias, one which was then later compounded by the threat allegation, investigation, and related security measures.

Referring to the "Pathfinder Proceedings" Your Honor made the following ruling:

The basis for Mr. Brooks' last adjournment culminated, after several months, in Mr. Brooks filing a meritless motion to dismiss.

Order of the Court dated January 11, 2011, page 4.

Given the facts underlying the "Pathfinder Proceedings" it was unreasonable and prejudicial to characterize it as "meritless."

At sentencing, four years later, Your Honor made the following statements which demonstrated that the "Pathfinder Investigation" created a personal judicial bias in you towards me and had a negative impact with regard to your decisions in my case including but not limited to the sentence imposed.

THE COURT: And the government doesn't take a position in terms of what has been offered as delusional activity on the part of Mr. Brooks, the conspiracy with DuPont, Mr. Acchio, witch doctors, and the special investigation, public integrity investigation that was done? No issue with any of that?

(Transcript of August 12, 2013, P.175)

15

> **THE COURT**: However, prior to trial, the defendant, with new counsel, managed to convince the Department of Justice's Public Integrity Unit to do a full investigation of various claims made by the defendant that Pathfinder and other individuals were taking bribes.

(Transcript of August 15, 2013 p. 262).

The allegations contained in the "Pathfinder Investigation" tainted Your Honor and infected every aspect of Your Honor's mindset with regard to my case. This includes, but is not limited to, Your Honor's rulings on motions, your acceptance of Angela Jett's Affidavit with regard to the revocation of my bail (***without any credible and actual evidence being presented to you by the government even up to the present time***), your deliberate inability to control of the lack of medical attention I received in prison, and ultimately my greatly enhanced sentence. Your clear partiality after the "Pathfinder Investigation", coupled with the obvious personal judicial bias and prejudice that resulted from the "alleged threat" of violence screams out for your "necessary and proper" recusal in this case, or at a minimum a referral to a neutral judge to adjudicate the issue.

## IV. The Jury Was Entirely Mismanaged / The Court Should Have Declared A Mistrial

### A) Deliberations

Your Honor's mismanagement of the jury resulted in a severe breakdown of jury deliberations in this case due to your bias, prejudice and vindictiveness. Therefore, it is without question that the multiple mistrial motions that were made should have been granted. Throughout the course of deliberations, Your Honor received various notes indicating the dysfunction that beset the jury as a decision-making body. (Court Exhibits 17, 28, 36, and 37 – Composite Exhibit **E**) **As Your Honor is aware, the number and the nature of these letters** (attacking other jurors, a juror requesting sequestration, jurors requesting to be dismissed, and one juror

indicating that he may obtain counsel to assist him in his request to be removed from the jury) **demonstrated an irreconcilable breakdown of deliberations**. Similarly, each of these letters, directly or indirectly, expressed a belief by the jury that they were not able to reach a verdict in this case.

**The Second Circuit has observed that "requiring a jury to continue deliberations despite genuine irreconcilable disagreement more often than not defeats the ends of public justice; not only will such compulsion needlessly waste valuable judicial resources, it may** *coerce* **erroneous verdicts."** *United States v. Goldstein,* **479 F.2d 1061, 1068 (2d Cir. 1973) (emphasis added).** That is certainly what happened in my case. The courts in this Circuit have recognized several factors in considering whether a mistrial must be declared, including: (1) the jury's opinion about its ability to reach a verdict; (2) the length and complexity of the trial; (3) the length of deliberations; (4) the jury's communications with the court; and (5) the coercive impact of future deliberations. *United States v. Colombo,* 2007 WL 2438391 (S.D.N.Y. Aug. 27, 2007).

The jury deliberation issues raised in several notes from the jury, including the extremely unusual "letters" submitted by two jurors, reveal a disturbing breakdown in the functioning of the jury as demonstrated by these "letters" - replete with internal accusations and life-threatening allegations. For example:

- Court Exhibit 17: requesting that the Court provide additional instructions regarding the deliberation process and a "pep talk";

- Court Exhibit 36 "[W]e feel that if things don't change all this time of listening to witnesses, lawyers and fellow juror's opinions will all be wasted because some jurors will get disgusted and fed up and not make rational decisions";

- Court Exhibit 37 "To that I appreciate your 'pep talk' but it has [sic] apparently fallen on deaf ears"

According to Juror 9, the jury as a whole (not only one or two jurors) had not even discussed the case for three full days. ("For the last three days we the jury have rarely talked or discussed anything about the case.") (Court Exhibit 36) The "letter" from Juror 9 expressed concern that **"tension in the jury room [was] unbearable,"** and indicated that the deliberations have resulted in "very heated and uncalled for" arguments. (Court Exhibit 36)**. In fact, one juror (Juror 5) expressed concern for his personal safety**. (Court Exhibit No. 37). Finally, and most importantly, several of these **communications revealed that undue influence and coercion may have been applied to individual jurors in order to influence their decision** - even if that decision may have run contrary to the juror's personal evaluation of the evidence.

### Jurors 5 and 9 Should Have Been Dismissed

Through my counsel it was requested that Your Honor dismiss Jurors 5 and 9 in light of the "letters" received from those jurors. (Court Exhibits 36 and 37). These letters were provided to Your Honor in **blatant derogation of your repeated instructions**. Thus, based upon these jurors' obvious inability to follow your instructions they should have been dismissed. Where jurors have refused to follow a judge's instructions, courts have not hesitated to dismiss them. *United States v. Vega,* 72 F.3d 507, 512 (7th Cir. 1995) (affirming dismissal based on failure to follow instructions); *United States v. Luisi,* 568 F.Supp.2d 106, 122 (D. Mass. 2008) (under Federal Rule of Criminal Procedure 23(b), a deliberating juror may be removed for "good cause," a broad term that has justified the dismissal of jurors for failing to follow the district court's instructions) (citing *United States v. Kemp,* 500 F.3d 257, 304 (3d Cir. 2007)); *see also United States v. Edwards,* 303 F.3d 606, 631 (5th Cir. 2002).

18

Throughout the trial, Your Honor repeatedly instructed the jury not to consider or discuss this case once they leave the courthouse, and to refrain from revealing the nature and content of their deliberations (even to Your Honor). Trial Transcript p. 20999

The court in *United States v. Baker,* 116 F.3d 606, 618 (2d Cir. 1997) noted that "[t]he secrecy of deliberations is the cornerstone of the modern Anglo-American jury system .... Indeed, courts and commentators alike recognize that the secrecy of deliberations is essential to the proper functioning of juries."

Yet, in clear violation of your directives, and the overriding need for secrecy in its deliberations, **two jurors submitted letters revealing the substance of the jurors' deliberations**. These letters were both submitted to Your Honor on August 25, 2010, and included a description of the tensions that had apparently formed in the jury room, and provided insight into the deliberations. (Court Exhibits 36 and 37). One letter explicitly discloses the thoughts of at least one juror, (Court Exhibit 36) ("One other juror is basing her decision on the way her heart feels about the defendant."), while the second letter disclosed thoughts about multiple jurors, (Court Exhibit 37).

Based upon the format and timing of each of these letters, it is clear that these jurors violated your instruction to leave the case at the courthouse and to consider the case only with all jurors present. Notably the two jurors' letters are strikingly similar in many respects. Both letters were typewritten and composed after the jurors were dismissed on August 25, 2010, and before they returned on August 26, 2010. Presumably the two letters were authored either at home, or at least, not in the courthouse. Moreover, you received the two letters within approximately two hours of each other. In addition, both letters contained curiously overlapping factual allegations.

In each letter, the authors stated their belief that certain jurors were not participating appropriately in the deliberation process as a pretext to avoid returning to their jobs.

It is evident that the tone, style, and format of each letter suggested that these jurors collaborated in bringing their purported concerns to your attention. Similarly suspect, is that these two jurors, brought their concerns to your attention on the same day, at nearly the same time, in the same typewritten format, and through similar, overlapping allegations. **Juror 5 added that he was in fear for his personal safety and, inexplicably suggested he might hire an attorney,** stating:

> **If none of this is possible and this continues, I will be put [sic] in harms [sic] way with regard to my life. I will be put in a position to contact council[sic] myself and directly request that I be removed." Certainly, a juror who fears for his personal safety and threatens retaining counsel to be released from service should not be permitted to continue deliberating.**

Additionally, it is particularly evident from the letter by Juror 9 that there was a complete breakdown of jury deliberations in the case. Juror 9 complained that "[w]ith respect to one juror, almost never does he answer the question he is asked, he only repeats the question that he was asked. He more or less deflects the question." Juror 9 clearly suggested that there was a refusal to communicate amongst the jurors and perhaps **bullying** on the part of some of the jurors.

With regard to Juror 5, his stated problem was "there are people playing[] games in that they refuse to communicate, when they do make statements they are[ ] short, confusing and unclear, the statements are given whereas no deliberation[] or conversation can be had from them."

Thus, it appears that Jurors 5 and 9's real objection was that certain other jurors were not communicating what they wanted to hear rather than that they had not engaged in deliberations. Again, your obvious mismanagement of the jury resulted in a total breakdown of the jury

process. Inquiry of a juror and her removal was upheld in *United States v. Baker,* 262 F.3d 124 (2d Cir. 2001), where the juror apparently repeatedly expressed a refusal to deliberate beginning less than <u>two hours</u> after deliberations commenced, and a series of juror notes left no doubt regarding the juror's recalcitrance.

### The Court's Erroneous Instruction

The jury's failure of justice was compounded by **Your Honor's erroneous instruction that jurors must give their opinions**. Your Honor instructed the jury to "[p]lease try to understand that each juror is required to deliberate, and that means that each juror must listen to the opinions of your fellow jurors and ***must give their opinions and reasons or particular opinions.***" (Trial Transcript p.21301) (emphasis added). Jurors are *not* required to "give opinions and reasons for particular opinions," any more than they need be able to give a "reason" in order to have a "reasonable doubt." *See Chalmers v. Mitchell,* 73 F.3d 1262, 1268 (2d Cir. 1996) ("In earlier decisions we have warned that jury instructions that imply that jurors should be ready to give a reason for their doubts are 'not approved' and 'perhaps unwise' but have never held such an instruction to be reversible error. [citations omitted] The danger in such an instruction is that a jury will take it to mean that they must be ready to articulate a reason for their doubts").

Additionally, Your Honor exhibited your underlying vindictiveness and personal judicial bias when addressing the jury as follows: "DHB makes and sells protective body armor to the U.S. Military and Federal and State Agencies. This case involves only allegations of financial fraud. There are no allegations concerning the quality or safety of DHB's products, nor have there ever been any such charges." There was no necessity for saying "[t]here are no allegations concerning the quality or safety of DHB's products, nor have there ever been any such charges." It was unnecessary to even mention this. But, it is obvious that this, among other issues, were

21

paramount in your mind which resulted in your unfair personal judicial bias toward me, including bias stemming from the previously described civil litigation involving me that Your Honor was presiding over, and appears to have predisposed Your Honor into a prejudicially biased mindset.

### The Court's Coercive Instruction

In addition, Your Honor's instruction to the jury that they would be required to sit on Fridays was coercive. This is particularly so since the jurors had not been required to sit on Fridays for seven months. Several jurors indicated during *voir dire* that they work on Fridays and were being pressured by employers and fellow employees to get back to work full-time. Informing jurors who were already under such pressures that they will now have to tell their employers and fellow employees that they now will not be able to work on Fridays surely added more pressure on the jurors and coerced a verdict, particularly given that they had impermissibly revealed details regarding deliberations.

Further, Your Honor should have instructed the jury, consistent with the purposes of Fed. R. Crim. P. 32.2(b)(5)(A), that it might have an additional task following its verdict. Your Honor received several juror notes expressing frustration with the pace of the deliberations and otherwise reflecting the jurors' understandable expectation that their roles in this case would be concluded once their verdict was announced. **As the jury had already reached a boiling point, if they had been properly instructed, and told that a verdict of guilty would require them to return to hear additional evidence and engage in further deliberations with regard to forfeiture, it would have leveled the playing field and not resulted in you giving the prosecution a significant unfair advantage.** As Congress explained when it enacted subdivision (b)(5)(A):

> Jurors who know that they may face an additional task after they
> return their verdict will be more accepting of the additional
> responsibility in the forfeiture proceeding, and the court will be
> better able to plan as well.

The Amendment clarifies the procedure for requesting a jury determination of forfeiture. The goal is to avoid an inadvertent waiver of the right to a jury determination, while also providing timely notice to the court and to the jurors themselves if they will be asked to make the forfeiture determination. The Amendment requires that the court determine whether either party desires a jury determination of forfeiture in cases where the government has given notice that it is seeking forfeiture and a jury has been announced to determine guilt or innocence. The Rule requires the court to make the determination before the jury retires. This allows the court to plan, and also allows the court to tell potential jurors what to expect of their service.

The fact that Your Honor refused to tell the jury that if I was convicted they would be required to deliberate for an additional period of time to determine forfeiture issues prejudiced me severely and gave a significant advantage to the prosecution after the trial had gone on for approximately eight months. Given the turmoil that occurred during deliberations, it is clear that if the jury had been told that a guilty verdict would have resulted in them being required to return to determine forfeiture – it is my belief that a "not guilty" verdict would have been returned. It is quite obvious that Your Honor's personal judicial bias and prejudice against me fueled your decision to not properly instruct the jury despite the repeated strong arguments and mistrial motion by my counsel to do so.

**B)  Ex Parte Communications**

Your Honor's ex parte communications with at least one juror, namely Juror 4, regarding his oversleeping, whether he had driven to court with alternate Juror 1 (who allegedly he was having a romantic affair with),  during jury deliberations, violated my right to be present during

every meaningful stage of my criminal case. Additionally, your attempt to interfere with Juror 7's criminal proceeding by offering to contact the judge presiding over Juror 7's case also was a blatant *ex parte* communication that prejudiced my right to be present during every meaningful stage of my criminal case. (Transcript of September 3, 2010) *United States v. Collins*, 665 F. 3d 454 (2d Cir. 2012) (conviction vacated because of judge's ex parte communications with juror).

While recognizing the efforts Juror 7 had made to coordinate his jail term with the State Court and his job, Your Honor inquired a final time to see if Juror 7 was amenable to any modification of the schedule:

> **THE COURT**: What I was going to suggest, if I can contact the judge and say, hey, look, I will have him in at 5:00 o'clock, 5:30. I will set it up for you nice. I'm trying.

> **THE JUROR**: I know you are trying. I have to go in on the Thursday. My attorney, I have to meet with him Wednesday. And he wanted to go over what I needed to do. I know he told me some things that I need not do. So he said let's meet, whatever the day is beforehand, the 15th, and I'm going in the 15th.

> **THE COURT**: He wants to meet you after hours here potentially?

> **THE JUROR**: Yes. But I wanted to get my ducks in a row.

> **THE COURT:** Absolutely.

Given the obvious personal turmoil Juror 7 experienced in coming to terms with his legal problems, the efforts he obviously made with the State court and his job to coordinate the serving of his sentence and the assurances he received that Your Honor would not intervene by attempting to change the date for his surrender, it would not only have been unfair to Juror 7 to reverse course at the last minute, it jeopardized my right to a fair verdict. Requiring Juror 7 to sit on the jury despite being promised that he would be able to serve his sentence at the time he prepared for in all respects (mentally, emotionally, and logistically in terms of his family and

employment) created a situation in which Juror 7's ability to deliberate in a detached and objective fashion was irretrievably compromised.

Under these circumstances, we believe that it was apparent that Your Honor should have sought Juror 7's input and approval before delaying or seeking to delay his sentence on September 15-17, 2010. The fact that Your Honor did not excuse Juror 7 when Your Honor learned of the juror's criminal conviction and upcoming surrender date evidences Your Honor's personal judicial bias; the refusal to excuse a juror with a clear conflict of interest had the effect of unduly influencing the juror into reaching a quicker verdict than might otherwise have occurred. This obviously occurred as the jury verdict came back on September 14, 2010, just one day before Juror 7's sentencing.

### C) <u>Jury Tampering</u>

It is not every day that an FBI agent walks into a courtroom in the middle of a trial and seizes the contents of a defendant's waste basket and unsubstantiated statements are made based on a piece of paper, that I engaged in jury tampering. The prejudice that resulted from said actions and then the manner in which you responded, resulted in untold hours of argument by my attorney's, the government, and Your Honor, as well as the jury themselves potentially learning of the accusation while their deliberations continued to take place.

This was but just another example of Your Honor's obvious inability to properly manage the jury resulting in the jury, as stated above, undoubtedly deciding to render a guilty verdict regardless of whether it would be at the expedience rather than a thoughtful deliberation. Again it is clear, that subsequent to the "Pathfinder investigation" you exhibited a clear personal judicial bias toward me and demonstrated a clear appearance of extreme partiality toward the

government and to my detriment through the entire jury proceedings. There can be no other explanation as to why you would mismanage the jury so terribly and refuse to declare a mistrial.

Your clear repeated partiality toward the government after the "Pathfinder Investigation", coupled with your failure to recuse yourself, *sua sponte* once you learned of the alleged threat of violence, created a personal judicial bias and vindictiveness that cannot be ignored.

## V.    **The Government's Refusal To Turn Over 302s**

The personal judicial bias and prejudice of Your Honor pervaded every area of this case. It was further exhibited by your dismissive attitude with respect to the position of the government towards my counsel, Richard Levitt's request for the 302 notes related to Dawn Schlegel's numerous and extensive proffer sessions with government agents and prosecutors.

Dawn Schlegel was the government's star cooperating witness; she testified over the course of twenty-three days. On cross examination, Schlegel stated that in connection with her cooperative efforts she had participated in hundreds of meetings with government agents and prosecutors. (Trial Transcripts P. 6750).  Schlegel further testified that the agents took notes during the vast majority of these meetings – "about 85 percent" of the time. (Id. at 7075).

Schlegel's testimony was consistent with testimony offered by Agent Jett of the FBI almost two years earlier at a bail hearing.  In that context, Jett testified that she had personally met with Schlegel approximately one dozen times during the course of 2007 and that she had taken notes during the course of these meeting and that some of her notes had been reduced to 302s.  (Docket Entry 921) Ex. A (Bail Hearing Transcript of June 2, 2008 P. 139)

> Q: "Would it be fair to say you have numerous 302s relating to Ms. Schlagel [sic]?
>
> A: Numerous notes and / or 302s.").

Despite Schlegel's clear and undisputed testimony that she had met with government representatives literally hundreds of times, the government's production of Schlegel's interview notes and/or 302s pursuant to its obligations under Title 18 U.S.C. § 3500 was deficient and contained just a handful of documents which were entirely insufficient to permit the defense to analyze whether Schlegel's story evolved over time to conform with the government's evolving theory of the case. Schlegel's counsel was permitted in the courtroom to observe the theories and objectives of my defense. This amounted to a scenario where the star witness against me had a virtual presence due to her attorney's presence in the courtroom at my trial and thus she obtained advance knowledge of defense strategy before, during, and after her scheduled testimony.

When the government responded to an inquiry as to the production of the 302s and indicated that there were only approximately three (3) 302s, which Mr. Ott stated did not even qualify in his opinion as "*Jencks*" material, my attorney Mr. Levitt responded as follows:

> **MR. LEVITT**: Let's make clear then what the government is arguing. **Because it's important because we are in a public courtroom here and they are making announcements concerning their obligations. If it's the government's position that 302s in this district are not discoverable because they are not adopted by the witness, then so be it.** That's what I just heard the government say. **So apparently they are now announcing the policy of the United States Attorney's Office for the Eastern District of New York, that 302s of a non-testifying agent, of an interview with a witness are not discoverable.** That's their position, unless the witness adopted it. Just to be clear, that's what Mr. Ott just said. Now getting back to the issues before the court, the first issue is whether or not the government should at least provide the court in camera the three so called draft 302s.

Trial Transcript of April 8, 2010, P.9560.

Your Honor's failure to order the government to provide information, which clearly existed and which they were clearly required under the Jencks Act to turn over, was not only a

violation of my Constitutional rights but also demonstrated, yet again, your clear personal judicial bias and prejudice toward me and partiality toward the government.

By way of comparison, when my attorney, Kenneth Ravenell was cross-examining Schlegel with regard to an email she had sent, Your Honor demanded that the metadata from the email be provided. After receiving the metadata the government further asked for the hard drive and you succumbed. Your Honor, showing your clear vindictiveness toward me, went so far as to issue an order improperly stating that Mr. Ravenell's trial tactics smacked of "McCarthyism." Moreover, Your Honor sanctioned me and held me in contempt of court.  Your clear double standard with regard to the government's concealment of its Jenks Act obligations shows an overwhelming partiality for the government and a harsh personal judicial bias, extreme prejudice, and vindictiveness toward me.

## VI.    This Court's Mismanagement Of My Medications

I have been diagnosed by my independent doctors, Doctor Park Dietz, Doctor James Ballenger and Doctor Michael Liebowitz with bipolar disorder, agoraphobic anxiety (also known as panic attacks), paranoid personality disorder, post-traumatic stress disorder and obsessive compulsive disorder.   The diagnosis of psychosis N.O.S, along with post-traumatic stress disorder, paranoid personality disorder and anxiety/panic disorder have all been confirmed by the government's psychiatrist and expert Doctor Mark Mills.

For the past thirty-five years I have taken medication on a daily basis to combat the effects of these illnesses.  These medications affect my ability to concentrate, to absorb facts and to have a general understanding of what is happening around me.  These drugs also combat the severe panic attacks that I suffer from. I need to take these medications on a daily basis or my cognitive ability is extremely impaired.

On January 14, 2010, I was taken into custody based solely upon the highly questionable and hotly contested affidavit of Special Agent Angela Jett. I was initially detained at the Nassau County Correction Center ("Nassau"), and thereafter moved to the Queens Private Detention Center ("Queens") on January 29, 2010. From the moment of my incarceration my medication was mismanaged and Your Honor was made fully aware of it.

For example, jury selection began on January 19, 2010. At that time my attorney informed you that I had not received any benzodiazepines since being arrested five days earlier. After verifying that the prescription was valid by speaking to Doctor Liebowitz, you only allowed me to take one Ativan that day in the courtroom.

Jury selection continued on January 20, 2010. My counsel again informed you about medication mismanagement. Specifically you were advised that Nassau was not providing me with any benzodiazepines. Thus you issued an Order stating the prescription was "lawfully filed" and "medically necessary" and directed Nassau to administer Ativan to me. (Docket Entry 761) Notwithstanding your Order, I did not receive any Ativan at Nassau. Therefore, my medication was basically non-existent during jury selection breaching my constitutional right to select my own jury.

Given the nature of my illnesses and the medication that I was denied, I assert that the result was a clear lack of

> (1) my ability to select a jury;

> (2) my ability to assist my lawyers in my defense;

> (3) my ability to decide whether or not to testify; and

> (4) my ability to testify and be subject to cross examination.

Accordingly, I was denied a fair trial.

Notably, due to the abusive treatment I received at both facilities, Nassau and Queens, I was forced to file a *Bivens* action which is currently pending in the United States District Court for the Eastern District of New York. (*Brooks v. Sposato*; 12 CV 4740 (SLT)). The defendants in the *Bivens Action* are the Marshals assigned to Your Honor's courtroom. You will be called as a witness to testify against them. Your testimony will establish that they (1) deprived me of my medication by intentionally violating your Orders, (2) violated the Bureau of Prisons Rules and Regulations, and (3) violated my Eighth Amendment Constitutional rights. Their actions resulted in the damages that I am seeking in the *Bivens Action*. I believe that your knowledge of the fact that you will have to testify against your own courtroom Marshals has prejudiced your rulings in my criminal case; specifically the denial of motions filed as to my mental condition and mental capacity.

Knowing that I was not receiving my medication, you should have immediately sought an independent competency evaluation, but instead you relied on the prejudicial statements and evaluation of a non-medical professional William Zerillo who prided himself in being a friend of yours. This was clearly an abuse of discretion emanating out of your personal judicial bias and prejudice that had developed from the "Pathfinder Proceedings".

The following is an excerpt from an email that William Zerillo, warden of the Queens Private Detention Center sent to Ernie Dixon regarding my medical care on February 9, 2010.

> **We are on top of this situation and if the private psychiatrists recommendations are accepted and ordered – and if they are not compatible with what we feel is safe and appropriate we will do as Nassau Count did; have Mr. Brooks removed from the facility.**

In determining a motion with regard to my mental competency, **Your Honor employed the wrong legal standard. Your Honor ruled that the facts established by me about my**

mental illnesses were "not sufficient to positively, unequivocally, and clearly generate a real, substantial, and legitimate doubt as to [my] mental capacity" (Docket Entry 1546) However, the standard to determine mental competency is by a preponderance of the evidence.

Despite the fact that you denied my mental capacity motions during trial, at sentencing, after receiving the expert reports, you acknowledged that it was an issue. Notably, at sentencing you stated:

> **THE COURT: [W]ith respect to the mismanagement of the defendant's medications by various institutions as constituting punishment, I will consider that.**

(Transcript of August 15, 2013, p. 338).

Again, it is clear, that subsequent to the "Pathfinder Investigation", you exhibited a personal judicial bias toward me. There can be no other explanation what so ever as to why you would proceed with trial knowing that I was not receiving my prescribed medications.

### Mismanagement Of Medication Timeline

For a period of five to six weeks at the commencement of my trial, I had been deprived of the medication prescribed by my personal physician Doctor Liebowitz.   However, upon receiving correspondence between Jason Mafia (an employee at the Queens Private Detention Center) and Warden Zerillo, you acquiesced to the wrongful withholding of my mediation which negatively affected my due process rights and my right to a fair and impartial trial.

The following is a timeline of the mismanagement of my medication and your acquiescence to the mismanagement.

- January 27: The Court and defense counsel realize that no one knows how much Ativan Brooks has been actually taking in the courtroom since January 19. The Court labels

it "a dangerous situation." On both January 27 and February 3, 2010, the Court and defense counsel acknowledged that no one is supervising or monitoring Brooks medication in the courtroom, and that no one knows how much Ativan he is taking each day during the court proceedings.

- February 3: The Court learns that Brooks has been "bugging people ... for medications." The Court and defense counsel - again - confirm that no one knows how much Ativan Brooks has been actually taking in the courtroom. The Court is informed by Queens that someone there has the opinion that Brooks is "being overmedicated." The Court reverses course and decides that Brooks can no longer receive medication of any kind (including Ativan) in the courtroom. Brooks receives no Ativan, or other benzodiazepines. Testimony of Elinore Kaye, Jay Chin, Charles Karp and Elaine Pesky.

### Bizarre Behavior Due To Lack Of Medication

- January 14: Brooks suffers a serious panic attack, reports problems breathing, and is taken to the emergency room at Cornell Presbyterian Hospital.

- February 16: Defense counsel interrupts proceedings to tell the Court that Brooks has been "twitching too much," and that he has been alarmingly "placid" and "under some distress" during proceedings. Later, the Court also learns of the "Code Blue" incident, in which Brooks suffered a severe panic attack at Queens early that morning, requiring emergency treatment.

- February 17: Defense counsel again interrupts proceedings when Brooks suddenly leaves the courtroom, scurrying toward the Marshal's pen "in front of the jury." Brooks' co-defendant tells her attorney that "[s]he has seen him have panic attacks before and she said to me at one point today he's getting ready to have an attack." Later, Brooks actually "passe[s] out for a moment" at counsel table. Brooks, clearly incoherent, tells the Court that "I was thinking of a good thought." Defense counsel states that the incident "scared the heck out of me."

- February 18: Defense counsel states that Brooks told him that "he is not feeling well at all, doesn't feel he can go forward until he gets some medication."

- February 22: Defense counsel again interrupts proceedings because Brooks "has been having some kind of difficulty .... I must ask for a break to find out what is going on. He is constantly pulling his shirt. He is not feeling well."

## **Medical Opinions**

- January 16: Dr. Liebowitz informs the Court that, in his medical opinion, Brooks "must be put on [Ativan] or a comparable benzodiazepine immediately."

- February 3: A Queens email reports the conclusion of a staff psychiatrist that Brooks "is most likely experiencing Benzodiazepine withdrawal." In a reply email, the warden warns of the risk of, "a negative physical reaction" when the Ativan Brooks is taking in court is combined with the medications given to Brooks at Queens, and that this "could result in a major health episode for Mr. Brooks."

- February 4: Dr. Liebowitz opined that Brooks "requires benzodiazepines such as Ativan to control his severe anxiety disorders," and that "abrupt cessation of Ativan in a patient who has taken it for a long period, as has Mr. Brooks, renders that patient susceptible to severe withdrawal reactions."

- February 8: At a hearing before Magistrate Judge Tomlinson, Dr. Liebowitz labels the situation as "very dangerous," and testifies that Brooks is likely experiencing a "withdrawal reaction" as well as "a relapse of his illness." He further testifies that the withdrawal of Ativan will have an impact on Brooks' ability to participate meaningfully in the defense of his case.

## **Statements By Defense Counsel**

- January 27: Brooks' counsel (Ravenell) states that "the honest truth is it affects us trying to help him when he doesn't have the medication ... I think he can participate better in helping us when he's medicated .... certainly he is able to better help us when I believe he's medicated."

- January 28: Brooks' counsel (Ravenell) states that Brooks "with some regard is acting out of desperation to be involved in his case, to make notes ... And he was deeply involved in this case every day, every night. And right now he can't be .... That's what the act of desperation is to help himself be medicated properly and help himself be able to work on his case."

- February 4: Brooks' counsel (Ravenell) states that "to have him involved here and having him involved in helping us at the trial, the Court is creating two problems if the Court doesn't allow him to have the medication as I suggested .... If he cannot function, I'm going to have an incompetent person sitting next to me in a very serious trial for his life, Your Honor."

- February 8: Brooks' counsel (Ravenell) states that "Now we are in a situation where, without receiving the medication in the courtroom, he now is without the medication in total, and we think it's imperative for him to function and help us in the courtroom, that he have his medication." Brooks' counsel (Shtasel) states that Brooks "needs to be participating in his defense and assisting counsel" and that "if this defendant is incapable of adequately assisting himself in a trial before Your Honor, it would seem because he is being given absolute medical treatment." At a hearing before Magistrate Judge Tomlinson, Brooks' counsel (Shtasel) states, in the present tense, that Brooks is "unable to adequately and meaningfully assist in his own defense, both in communicating with counsel, reviewing, retaining information, memory issues and those sorts of things, even though he's obviously able to speak English and communicate."

- February 9: Brooks' counsel (Ravenell) states that "None of us want to get in a situation where we are telling the Court he's not competent to help." Later, Brooks' counsel (Ravenell) states that "It's important for him to have the medication, we think, for him to be able to assist us throughout the trial." Brooks' counsel (Shtasel) states that "if [Brooks is] not receiving the medication that gets the balance together, then [he is] not in a position to adequately represent [his] own interests and to work with counsel. That's when you get into serious problems the way this whole trial is going to unfold[.]"

- February 15: In a letter response to the Report and Recommendation, Brooks' counsel states that Brooks is seeking "medically necessary medication in order to ensure that he is able to consult with his counsel and participate meaningfully in his defense. The record confirms that such medication is medically necessary to ensure that Mr. Brooks is able to participate meaningfully in his defense .... [W]ithout such medication, Mr. Brooks is unable to function normally." In the same letter, Brooks' counsel requests "that the Court permit Dr. Liebowitz to conduct a full psychiatric evaluation of Mr. Brooks ... in light of the manner in which Mr. Brooks has been treated ... to date."

- February 16: Brooks' counsel (Ravenell) states that Brooks has "barely said much to me all day long," and that he "is not communicating, and that's my concern." He adds that Brooks "has really not been engaged this morning at all. ... My only concern right now is to have him continue and not focus on the case." Later, Brooks' counsel (Ravenell) again requests that the Court permit "Dr. Liebowitz to examine him." Brooks' counsel adds that it will consult and determine "what we think we need to request." Finally, Brooks' counsel (Ravenell) adds that "[o]ne thing we were trying to avoid is getting to the point where we are asking the Court for a competency evaluation. We are trying to avoid that."

All of the above took place with Your Honor having knowledge that I was not receiving my proper medication.

### Actions of the Court

Based upon the foregoing, my fundamental constitutional rights were wrongfully taken away from me. The actions of Your Honor in not properly allowing my medication pursuant to the medical advice of Doctor Liebowitz, my personal physician who had observed my behavior for over thirty years, demonstrates your continuing vindictiveness and bias. Again, your dismissive attitude towards to the situation resulted in a highly negative and prejudicial trial during which I did not have the ability to participate in any meaningful fashion at any time. It

was a total abuse of discretion for you not to completely ensure that I was properly receiving my medication. The result was my inability to participate at trial and thus the denial of my due process rights.

## VII.   This Court's Handling Of My Bail And Bail Revocation

### A)   The Draconian Bail Conditions

After the first indictment was allegedly voted on, the government would not allow me to voluntarily surrender, as I had offered to do. Instead, the government insisted on arresting me in my apartment. Two months later, after extraordinary efforts by my counsel to reach an agreed upon bail package, I was released from jail. The conditions of my release can only be described as draconian. (Docket Entry 76)

I was confined to an apartment 24 hours a day and required to pay the expense of two armed guards. The only time I could leave the apartment was for court appearances and a monthly medical appointment, and then only on notice to the United States Attorney's Office. During these absences from the apartment, I was escorted by two or more armed guards. I was also required to wear an electronic bracelet to monitor my whereabouts. The two security guards in the apartment were authorized to conduct unannounced searches of the apartment at any time.

My visitors were limited to immediate family, two paralegals, my attorneys and their assistants. Anyone else had to be approved by the United States Attorney's Office. I was allowed no visitors at all from midnight to 7:00 a.m. Other than defense counsel and their staff – whose bona fides were to be checked by the United States Attorney's Office – only one visitor over the age of 25 was able to visit me at any one time. Conversations with my brother, Jeffrey, and with my paralegals (none of whom were allowed to visit for more than two hours a day) were monitored in-person by a security guard, who was required to prepare a statement regarding

36

the substance of each conversation. All visitors were searched, and had to surrender mobile phones and computers (other than computers used by attorneys to facilitate defense preparation).

I was permitted to use the telephone only between the hours of 9:30 a.m. and 5:30 p.m. and between 7 p.m. and 10 p.m., and not even then if so directed by the security guards. I was not permitted to use a mobile phone. The security firm listened to, logged, and recorded all telephone calls and monitored faxes. These recordings were provided to the United States Attorney's Office. The security firm was forbidden from recording attorney-client communications, but did so anyway, in violation of my attorney-client privilege. **The contents of my computer, and all of my computer activity, were monitored. The resulting records were made available to the United States Attorney's Office.**

The bail conditions placed upon me were clearly excessive given my lack of criminal history and the lack of any crimes of violence charged in the indictment. The bail restrictions were well beyond that ordinarily imposed in white collar non-violent criminal cases where the defendant is a first time offender. The imposition of such restrictions was not only an abuse of discretion, it was vindictive, and clearly showed Your Honor's partiality to the government.

**B)**      **Bail Revocation**

On or about January 14, 2010, Your Honor issued a warrant for my arrest. (Docket Entry 765) The issuance of the arrest warrant was based solely on the affidavit of lead FBI case agent Angela Jett. (Docket Entry 766)

Jett's integrity was called into question during the "Pathfinder Investigation" where it was alleged that she was willing to accept money as part of a settlement in the case.

Agent Jett's affidavit was replete with suspicion and unsubstantiated theories of how I violated my bail requirements. Specifically Jett advanced that 1) I had not accounted for all my

assets and 2) that I had not repatriated all of my financial holdings to the United States.

However, nowhere in the Jett Affidavit, which Your Honor accepted on its face, did it set forth any facts sufficient to establish by clear and convincing evidence that I violated any terms of my release.

Moreover, despite the conjecture in the Jett Affidavit, there was no money attributable to me found in any location, nor was there proof of accounts in other countries. Your Honor's decision to remand me based upon the unsubstantiated allegations in the Jett Affidavit is yet another example of the personal judicial bias created after the "Pathfinder Investigation" and your propensity to baldly accept the allegations of the government to my detriment.

Prior to executing my arrest warrant Your Honor inquired as follows:

> **THE COURT:** You indicate that the papers should be coming shortly with regard to these safe deposit box accounts, etcetera. Will they hopefully be available on Monday for a bail hearing?
>
> **MR. MISKIEWICZ:** I think unlikely.
>
> • • •
>
> **MR. MISKIEWICZ: ...In my experience this transmission can take a few weeks.**
>
> **THE COURT: A few weeks?**
>
> **MR. MISKIEWICZ: Or a month.**

(Transcript of January 14, 2010 p.7)

> **MR. OTT: As to the timing of the San Marino documents, we hope that will come in about a month. But because of the letter of rogatory process, San Marino is not operating by way of treaty.**

(Transcript of January 14, 2010 p.10)

Once again, with issues regarding my bail and the revocation of my bail you

demonstrated your personal judicial bias and partiality and judicial vindictiveness towards me. Despite the fact that the government promised to provide Your Honor with evidence to substantiate the allegation that I had foreign bank accounts in San Marino and/or Switzerland, to the best of my knowledge – now four years later – no such evidence has ever been provided. Your personal judicial bias is further evidenced by the comments you made at my sentencing regarding your unsupported belief that I have money in San Marino.

Additionally, based upon the fact that Your Honor had already declared the S-1 indictment a nullity (Docket Entry 1580) there is no basis in law or in fact for there to be a valid or binding bail agreement. Therefore, the Nineteen and One Half Million dollars ($19,500,000.00) that is improperly and illegally being held without jurisdiction in conjunction with my bail should be released and returned to me forthwith.

The fact that Your Honor prematurely remanded me without ever requiring the government to provide any evidence to substantiate the allegations in the Jett Affidavit with regard to foreign bank accounts, plainly shows that you were not fair and impartial in your decision making process.

## VIII.   The Nullity of the S-1 Indictment

My conviction and the trial that took place are repugnant to the basic concepts of the law. As Your Honor is fully aware, the S-1 indictment that caused my arrest and the seizure of my assets among other things did not exist. The foregoing is supported by your declaration that the S-1 indictment was a nullity. The law is clear that the SHAM S-1 indictment, which stripped me of my liberty and wrongfully restrained my assets was based upon a structural error. Knowing this, there is no just reason why your ruling declaring the S-1 indictment a nullity should not

have been issued *nunc pro tunc*. Notably, at the conclusion of the sentence proceeding. The following took place.

> **THE COURT**: Okay, unless there is something else-
>
> **MR. LUNGER**: No, Your Honor
>
> **MR. SHARGEL**: I think we are done here, Judge.
>
> **THE COURT: The first superseding indictment, whatever it is or it was, that's dismissed,   it's no longer in existence, right?**
> **MR. LUNGER**: I'm sorry, which indictment?
>
> **THE COURT**: The first superseding indictment, the one I deemed to be a nullity.

(Page 377 of Sentence Proceeding)

Your failure to declare the S-1 indictment invalid, *nunc pro tunc,* thus allowing my trial and conviction to stand, is not only evidence of your undeniable partiality, but a travesty of justice.

The original Grand Jury was empanelled in this case was on April 5, 2006. The Grand Jury returned an indictment on August 16, 2006 (06 Cr. 550). That indictment only charged Dawn Schlegel and Sandra Hatfield.

On October 23, 2007, Schlegel pled guilty before Your Honor to an S-1 information pursuant to the terms of a cooperation agreement she had entered into with the government. Your Honor accepted the S-1 information as valid.

Two days later, I was named for the first time in the S-1 indictment bearing the same case number.  However, because the judicial order authorizing these individuals to act as a grand jury had expired on October 5, 2007, they no longer constituted a Grand Jury.   As a result, the indictment they allegedly voted on was a nullity, which Your Honor has acknowledged (Docket Entry 1580, at page 4).  Thus my October 25, 2007, arrest on an incomplete arrest warrant was

illegal, and the government was not permitted to seek an indictment from a grand jury whose term had already expired.

Thereafter, on July 9, 2009, the alleged second superseding indictment was voted on by a new Grand Jury ("S-2"). S-2 was virtually identical to S-1, except that it added Lenex as a defendant in a single severed tax charge.

Accordingly, for the twenty-one month period between my arrest and the filing of the alleged valid S-2 indictment, I was illegally prosecuted. Moreover, I was denied my liberty and my assets were illegally confiscated. It also then follows that there was no jurisdiction for a bail agreement to be valid and binding, and thus it is my belief that the bail money, to wit: nineteen-million-five-hundred-thousand dollars ($19,500,000.00) must be released and returned to me forthwith. Moreover, there are several alarming peculiarities regarding the S-2 indictment.

> 1) There were no calendar minutes on Grand Jury Presentment for S-2 even though every other indictment voted by the Grand Jury had calendar minutes attached.
>
> 2) The only calendar minutes published for this grand jury on the date of the S-2 indictment (July 9, 2009), were attached to an indictment entitled *United States v. Mejia*, 09 Cr. 463. The July 9, 2009 calendar minutes, however, were unsigned, even though such minutes are signed by the Clerk of the Court in every other case.
>
> 3) The calendar minutes for the *Mejia* indictment has only the *Mejia* case number stamped on the minutes. There is no stamp for my docket number. On every other set of calendar minutes the docket number for every other case voted by that day's grand jury is stamped onto the calendar minutes.
>
> 4) The date on the calendar minutes for July 9, 2009 was whited-out and altered, which can clearly be seen by a review of the original version of the calendar minutes in the Clerk's Office.
>
> 5) A review of the over 700 indictment issued by this Grand Jury revealed that only indictment that did not include complete calendar sheets stamped with case numbers was the S-2 indictment in this case.

By the time S-2 was voted on, the Statute of Limitation had run and had barred the government from prosecuting me for many of the schemes that were alleged against me in the S-2 indictment. The government also violated my rights under the Speedy Trial Act, and my Constitutional Rights under the Speedy Trial Clause of the Fifth and Sixth Amendments to the United States Constitution, as I was not indicted within thirty days of my arrest and I was detained (or held under house arrest) and prosecuted for nearly two years without a lawful indictment, arrest and bond.

Further, the invalid S-1 is undeniably a "structural error" in the prosecution of my case. It is my belief that Your Honor should have granted my post-trial motion (Docket Entry 1598) challenging my conviction and Your Honor should have reversed my conviction without any need for a showing of prejudice. However, my post-trial motion challenging the validity of the S-1 indictment was filed and decided during the eight-month threat allegation; a fact that bares clear relevance to Your Honor's need to have *sua sponte* recused itself at that time.

Regardless of whether S-2 was valid, the government violated my Speedy Trial rights by not indicting me within 30 days of my arrest. The fact that this was raised after the jury verdict does not bar my claim as the S-1 nullity was concealed in bad faith and it was only Your Honor's personal judicial bias and animosity towards me that led Your Honor to deny my post-trial motions. Indeed, the government – which was in full possession of this information after I raised the issue – concealed in bad faith any answers as to whether S-1 was valid. I certainly cannot be blamed for the bad faith concealment of the government.

The only cogent explanation as to why Your Honor says nothing about what kind of investigation, if any, was made or whether Mr. Martin, the AUSA on the case or the Central Islip Grand Jury coordinator were even contacted. This was a clear example of personal judicial bias

and extreme vindictiveness towards me, which is particularly relevant in light of the timing of Your Honor's decision to deny my post-trial motions. Given the facts presented, and the overlap in timing between Your Honor's ruling and the covert "threat investigation", Your Honor's refusal to properly apply the law to the facts of my case evince a clear personal and judicial bias and mandates recusal.

## CONCLUSION

It is apparent that the unquestionable personal judicial bias and vindictiveness exhibited by Your Honor has pervaded my case from arrest to sentencing. The result was a complete and blatant denial of my due process rights. One need only point to the "alleged threats" of physical harm that resulted in an eight month investigation just prior to my undeniably extreme sentence as evidence of the need for your recusal in this case. Yet I have demonstrated above that there are many more examples in the record as well.


Sworn to by me this 27th day of December , 2013


_____
David H. Brooks


On December 27/2013, at 3:00 p.m. the person known to me to be David H. Brooks appeared before me at the Metropolitan Detention Center in Brooklyn, New York and placed his signature on the line above his name.


_____
Notary Public

Carla M. Comisso
Notary Public, State of New York
NO. 02CO6186874
Qualified in Queens County
Commission Expires 5/24/16